**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Doe[1], | No. CV-18-00384-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| State of Arizona, | |
| Defendant. | |

Pending before the Court is the State of Arizona's Motion for Summary Judgment. (Doc. 26). For the following reasons, the Court grants the motion in part and denies the motion in part.[2]

**BACKGROUND**

From 2006 to 2016, Plaintiff John Doe worked as a corrections officer at Arizona Department of Corrections ("ADOC") facilities in Arizona. Mr. Doe is a transgender male. He alleges that he was subjected to unabated harassment from his coworkers and supervisors that created a hostile work environment, caused him to fear for his physical

---

[1] John Doe is a pseudonym.

[2] Plaintiff's request for oral argument is denied because the parties have thoroughly discussed the law and the evidence, and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

safety, and ultimately forced him to resign in 2016. Defendant moves for summary judgment on Plaintiff's hostile work environment and constructive discharge claims.

The record, viewed in the light most favorable to Plaintiff, shows the following: in 2006, when he began working at ADOC, Mr. Doe was transitioning from female to male. Initially, Mr. Doe worked at the South Unit in Florence, Arizona as a Correctional Officer II. After completing his initial training, Mr. Doe informed his supervisors that he was transitioning. He acknowledged that this period of time would be "awkward," but requested that his colleagues respect his status, refer to him by male pronouns, or simply refer to him as Officer Doe.

Mr. Doe worked at the South Unit for about four years. Other correctional officers and his supervisors would sometimes call Mr. Doe a "she," a "he/she," an "it," a "d—" and a "b—." His fellow officers would also complain that Mr. Doe should not be using the men's restroom. (Doc 34-3 at 6). Mr. Doe often asked his supervisors if they could instruct other members of his team to refrain from calling him by "she" and also refrain from using derogatory language towards him. At the same time, Mr. Doe also acknowledges that he did not report every incident of alleged harassment to his supervisors, and that some of the officers who made comments were reprimanded by their supervisor. When Mr. Doe would complain to his supervisors about his coworkers calling him "she," his supervisors did not take corrective action. (Doc. 34-2, Ex. 1 at 18). During one of these conversations, Lt. Randolph told Mr. Doe to "stay to himself" because the female correctional officers "feel uncomfortable with you."[3] (*Id*. at 19).

This harassment reached an initial climax in 2010, when Mr. Doe's tires were slashed in the parking lot of the prison. Mr. Doe informed Deputy Warden Moody and provided him with photos of the incident, but Deputy Warden Moody did not respond to his complaint. Mr. Doe then informed Warden Carson McWilliams, head of the Florence Complex, of the tire incident as well as other statements that made him fear for his safety.

---

[3] In his testimony, Plaintiff also recounts several instances where the inmates informed him of other officers' statements. Those statements, however, do not appear to be admissible at trial. As a result, the Court does not consider them here.

Warden McWilliams agreed that Officer Doe had reasons to fear for his safety and agreed to transfer him to the prison's administrative unit, also known as the "Complex." (*See* Doc. 27, Ex. D). Although ADOC agreed to transfer Mr. Doe, it did not perform an official investigation into who slashed Mr. Doe's tires.

At Complex, Mr. Doe's coworkers continued to make offensive comments. His supervisor, Sergeant Wall, repeatedly referred to Mr. Doe as "she," and told other officers that he used to be a female, against Mr. Doe's wishes. At one point, Sgt. Wall stated, "did you know that [Mr. Doe] used to be a female. . . [c]an you believe that s—?" (Doc. 34-3 at 16). Shortly thereafter, many of Mr. Doe's coworkers asked him unwelcome questions about his gender status. Mr. Doe complained to Sgt. Wall about these statements and questions, but Sgt. Wall did not take corrective action. Due to this situation, Mr. Doe requested another transfer.

In October of 2011, Mr. Doe was transferred to the North Unit. (Doc. 27, Ex. E). Again, Mr. Doe's supervisors and coworkers continued to discuss his transgender status, against his wishes. During a staff briefing, Mr. Doe's supervisor, Lieutenant Clark suggested that the officers should hesitate before investigating a sexual assault of a transgender female in the prison. Years later during his time at North Unit, two other correctional officers told Mr. Doe that they had heard other officers discussing Mr. Doe's transgender status with some of the inmates. One of the officers who allegedly told inmates about Mr. Doe's status was his direct supervisor, Lieutenant Clark. Fearing for Mr. Doe's safety, one of these officers immediately filed an information report with ADOC documenting her concern. (Doc. 34, Ex. 5). Another officer informed Mr. Doe that his supervisor, Lieutenant Clark, had referred to him as a "he/she." ADOC did not investigate the information report filed by the other officer.

In response, Mr. Doe filed his first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that his "employer has breached my confidentiality of my being a transgender individual which was resulted in

jeopardizing my safety with the work environment." (Doc 34, Ex. 3). Due to a lack of corrective action, Mr. Doe then requested an additional transfer.

Mr. Doe was then transferred to the Papago Unit in Douglas, Arizona. Mr. Doe worked at Papago from July 2015 until he submitted his resignation letter in 2016. While at Papago, Mr. Doe's supervisor, Lieutenant Buldoc, made offensive comments. Specifically, he referred to a prominent transgender celebrity as a "nut job," stated that he would like her in his prison because she would be "one sorry b—." Lieutenant Buldoc also made comments about Doritos Rainbow Chips, stating "what the hell this is about paying 15, 20 bucks for a stupid bag of Doritos," and "who in their right mind would pay for Doritos like that to support the queers." (Doc. 34-5 at 1). Another supervisor, Sergeant Fredrickson, allegedly criticized Mr. Doe's performance on the job, and scrutinized his extended sick leave when he returned to the job. Mr. Doe did not file any complaints with ADOC regarding these incidents during his time in Douglas. Citing interference with his sick leave, Mr. Doe finally resigned from his position in April of 2016. (Doc. 27-3 at 27).

**DISCUSSION**

**I.    Legal Standard**

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Parties opposing summary judgment are required to "cit[e] to

particular parts of materials in the record" establishing a genuine dispute or "show[] that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

**II.     Analysis**

    **A.     Hostile Work Environment**

Title VII guarantees employees "the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank FSB v. Vinson*, 477 U.S. 57, 65 (1986).[4] In the context of a hostile work environment claim, courts must examine the "cumulative effect" of the individual acts of harassment when determining whether the conduct was sufficiently "severe or pervasive." *See Arizona v. GEO Group*, 816 F.3d 1189, 1206–07 (9th Cir. 2017). The Ninth Circuit has explained that "[t]he required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct." *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1105 (9th Cir. 1998). "Offensive comments do not all need to be made directly to an employee for a work environment to be considered hostile." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1095 (9th Cir. 2008) (internal citations omitted).

To survive at the summary judgment stage, Mr. Doe must show a genuine factual dispute as to (1) whether a reasonable person in his position would find the workplace so objectively and subjectively hostile toward transgender men as to create an abusive working environment, and (2) whether ADOC "failed to take adequate and remedial and disciplinary action." *Id*.

Plaintiff points to sufficient facts to survive summary judgment on this claim. His supervisors regularly disregarded his requests to conceal his status for the purpose of protecting his safety,[5] and repeatedly engaged in behavior that may be considered

---

[4] At this stage, the parties do not contest that Title VII's protections apply to transgendered individuals who are discriminated against on the basis of their gender identity, and therefore harassment against those individuals constitutes "discrimination on the basis of sex." (Doc. 41 at 3).

[5] Defendant asserts that mere discussion between Mr. Doe's supervisors and coworkers of Mr. Doe's gender status, or their legitimate, and facially inoffensive inquiries

- 5 -

harassment by a jury. "In close cases such as this one, where the severity of the frequent abuse is questionable, it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment." *Davis*, 520 F.3d at 1096; *see also Roberts v. Clark County School District*, 215 F. Supp. 3d 1001, 1016–17 (D. Nev. 2016) (denying defendant's request for summary judgment on a Title VII harassment claim, where supervisors disclosed plaintiff's transgender status to his coworkers).

A jury could also conclude that the remedial action taken by ADOC was insufficient. When determining whether a remedy was sufficient, "Title VII requires more than a mere request to refrain from discriminatory conduct." *Dawson v. Entek Intern.*, 630 F.3d 928, 941 (9th Cir. 2011); *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991) (explaining that a transfer, without reprimanding the alleged harasser, is generally insufficient remedy); *see also Mockler v. Multnomah County*, 140 F.3d 808, 813 (9th Cir. 1998) (noting that the "failure to interview witnesses is evidence of inadequate remedial action"). Specifically, the Ninth Circuit has explained:

> Nor . . . can the purported offer of transfer be counted as sufficient: harassment is to be remedied through actions targeted at the harasser, not the victim.

47 F.3d 1522, 1530 (9th Cir. 1995) (internal citations and quotation marks omitted). Here, there is no evidence ADOC investigated most of Mr. Doe's complaints. Mr. Doe repeatedly informed his supervisors of the alleged harassment, including that he wished to conceal his status. Yet even after one of his supervisors agreed that he had reason to fear for his safety, there is no evidence that ADOC opened an investigation into the tire slashing incident or took sufficient steps to prevent inmates from finding out about his status after

---

to him about that status, cannot constitute harassment as a matter of law, even though Mr. Doe asked them to refrain from doing so. (Doc. 41 at 5). Even assuming that this is true, however, it is different in kind than some of the facts here that suggest that at least some of his supervisors and co-workers revealed Mr. Doe's status as transgender to his coworkers and inmates in a way that could contribute to a hostile work environment for him. *Roberts v. Clark County School District*, 215 F. Supp. 3d 1001, 1016–17 (D. Nev. 2016) (denying defendant's request for summary judgment on a Title VII harassment claim, where supervisors disclosed plaintiff's transgender status to his coworkers). Here, a jury could conclude that in this context, disclosing his gender status to his coworkers increased the risk that his status would be disclosed to inmates—thereby causing him to reasonably fear for his safety.

his transfer. Nor is there any evidence that ADOC informed Mr. Doe's supervisors that this was a confidential issue to monitor once he was transferred. When Mr. Doe complained that other officers—including his supervisor—were informing the inmates of his status at North Unit, ADOC failed to undertake an investigation, did not reprimand the officers involved, and instead just transferred Mr. Doe once more.

### B. Constructive Discharge

Generally, constructive discharge occurs where "the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000). To demonstrate constructive discharge, Mr. Doe must point to facts from which a jury could infer "conditions so intolerable that a reasonable person would leave the job." *Id*. Notably, it is generally more difficult to prevail on a constructive discharge claim than it is a hostile work environment claim. *Id*. (explaining that if a plaintiff fails to point to facts that could establish a hostile work environment, he necessarily fails to meet the higher standard of constructive discharge).

When evaluating a claim of constructive discharge, a court evaluates the conditions of employment around the time of resignation. *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1466 (9th Cir. 1994). Courts put "the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Poland v. Chertoff*, 494 F.3d 1174, 1184-85 (9th Cir. 2007).

Plaintiff points to the conduct of two coworkers in his attempt to demonstrate constructive discharge. First, he alleges that Sergeant Fredrickson scrutinized his job performance unfairly and made inappropriate comments regarding his extended sick leave. But Doe has failed to point to facts from which a jury could conclude that these acts were

- 7 -

1 discriminatory, or that they created the kind of intolerable environment necessary for
2 constructive discharge. *Steiner*, 25 F.3d at 1466.

3 Second, he points to two offensive comments made by Lieutenant Buldoc during
4 his time in Douglas. These comments were made in approximately September 2015 or
5 earlier—more than six months before Mr. Doe's ultimate resignation in April 2016. (Doc.
6 34-1 at 1). Lieutenant Buldoc alleges that he was unaware of Mr. Doe's transgender status
7 at the time that he made these comments—he simply knew Mr. Doe as a male colleague.
8 And Mr. Doe did not want any of his other coworkers to be aware of his protected status.
9 Mr. Doe does not provide any evidence, other than speculation, to support his assertion
10 that Lieutenant Buldoc was aware of his protected status. This is fatal to his constructive
11 discharge claim. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 87 (2d Cir. 2005)
12 (explaining that, to defeat summary judgment, plaintiff was obliged to offer evidence
13 indicating that persons involved in the discrimination had knowledge of her protected
14 characteristics); *Hayes v. Sotera Defense Solutions*, 2015 WL 6758294 at *3 (E.D. Va.
15 2015) (explaining that "there can be no discrimination without knowledge of the protected
16 characteristic"); *Brundage v. Hahn,* 57 Cal. App. 4th 228, 236 (1997) (holding that
17 summary judgment was appropriate where the employer's staff did not know of a plaintiff's
18 protected characteristic). Absent evidence that Lieutenant Buldoc was aware of Mr. Doe's
19 protected characteristic the Court cannot find that there are facts from which a jury could
20 conclude that there was discrimination that resulted in a constructive discharge.

## CONCLUSION

22 Plaintiff John Doe has pointed to facts from which a jury could find in his favor on
23 the hostile work environment claim. However, he has failed to point to facts from which
24 a jury could conclude he was constructively discharged. The Court will therefore grant
25 Defendant's motion in part and deny it in part.

26 / / /
27 / / /
28 / / /

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 26) is **GRANTED IN PART AND DENIED IN PART AS FOLLOWS**: Summary judgment is granted as to the constructive discharge claim. Summary judgment is denied as to the hostile work environment claim**.**

Dated this 8th day of July, 2019.

*G. Murray Snow*
G. Murray Snow
Chief United States District Judge